## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Earnest Jeffries (B-60030)      )
      )
      Petitioner,    )
      )    Case No. 21 C 3637
      v.      )
      )    Judge John Robert Blakey
Felicia Adkins,      )
      )
      Respondent.   )

## MEMORANDUM OPINION AND ORDER

Petitioner Earnest Jeffries, a prisoner at the Danville Correctional Center, brings this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging his 2015 state court convictions for home invasion, armed robbery, unlawful restraint, aggravated fleeing or attempting to elude a peace officer, and unlawful possession of cannabis. His petition raises seven claims: (1) the state postconviction appellate court abused its discretion; (2) insufficient evidence; (3) the state postconviction appellate court erred in finding certain claims forfeited; (4) ineffective assistance of trial counsel; (5) due process violations based upon (a) juror communications; (b) the trial court's response to jurors' questions during deliberations; and (c) the State's withholding of evidence; (6) Petitioner's accomplice was not a credible witness; and (7) ineffective assistance of appellate counsel. [1] at 18-81. As explained below, all of Petitioner's claims are either non-cognizable, procedurally defaulted, or meritless.

1

I.    **Factual Background & Procedural History[1]**

A.    **State Court Trial**

On August 28, 2014, Petitioner and Steven Simmons forced their way into an apartment at 855 Richard Street in Aurora, Illinois, restrained the occupants, stole cash and an electronic tablet, and fled. *People v. Jeffries*, 2018 IL App (2d) 151194-U, ¶ 4 ("*Jeffries I*"). This led to a high-speed police chase, a short manhunt, and ultimately Petitioner's arrest. *Id.* At the time of his arrest, Petitioner possessed marijuana. *Id.* Simmons pled guilty, admitted that he was one of the intruders who victimized the occupants of the apartment, and agreed to testify against Petitioner in exchange for a reduced prison term (10 years). *People v. Jeffries*, 2019 IL App (2d) 161095-U, ¶ 4 ("*Jeffries II*"); [16-6] at 1289–90.

The trial judge began jury selection with an overview of the criminal trial process. [16-6] at 346–60, and, following an afternoon break, addressed an additional matter not previously discussed, saying:

> ladies and gentlemen of the jury, I want to just clear something up. It was an instruction or a matter that I should have addressed probably initially but I want to let you know that I have given instructions to the attorneys not to talk to you when they are out in the hallway. So that's a very awkward thing from time to time when you run into somebody and they don't exchange greetings or small talk. But the decision that you are going to have to make has to be based upon the facts presented, not upon whether you like somebody or don't like somebody. So understand I have instructed them not to have any conversations

---

[1] The Court draws these facts from the state court record [16] and the decisions of the Appellate Court of Illinois. *See People v. Jeffries*, 2018 IL App (2d) 151194-U ("*Jeffries I*"); *People v. Jeffries*, 2019 IL App (2d) 161095-U ("*Jeffries II*"); *People v. Jeffries*, No. 2-19-0007 (Ill. App. Ct. Dec. 21, 2020) (unpublished summary order under Illinois Supreme Court Rule 23(c) ("*Jeffries III*")) [16-3]. The Court presumes the state court's factual findings to be correct, unless Petitioner rebuts this presumption by clear and convincing evidence, *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018))— a burden Petitioner has not met.

with you and that's based upon my ruling, not because they wouldn't want to talk to you.

*Id.* at 474.

During jury selection, three prospective jurors who were later selected to sit on the jury indicated that they had been victims of crimes. [16-6] at 398–400, 480–81, 489–90. Prospective juror Rapacz stated that his parents' home was vandalized "a long time ago" when he was six years old. *Id.* at 398–99. Prospective juror Figgins stated that she had been the victim of a theft and that someone who had been in her home previously came back and stole from her when she was not home. *Id.* at 480–81. And prospective juror Gensler stated that her car was broken into "many years ago" and items were stolen. *Id.* at 489. On questioning, Rapacz and Gensler responded that nothing about their particular situations would affect their ability to be a fair and impartial juror in Petitioner's case. *Id.* at 399–400, 490. And Figgins indicated that, despite the theft, she did not have "a bad taste in her mouth about the judicial system." *Id.* at 481.

Another prospective juror, Hay, when asked about her thoughts on the nature of the charges, stated that she wished people "would make better choices." *Id.* at 445. Petitioner's counsel exercised a peremptory strike to excuse prospective juror Hay from the jury. *Id.* at 462.

On questioning, two other jurors selected to sit on the jury, jurors Pauley and Kronkow, discussed whether and how the opinions of other jurors could impact their opinions. *Id.* at 449–50, 453. Pauley indicated that she "would have to hear the opinion and what people have to say" before her conclusion would be swayed by

3

somebody else, *id.* at 449, but that she would stick to her opinion if she saw things differently. *Id.* at 450. Kronkow agreed, stating that she would not let her opinion be affected by someone else's "unless, like [Pauley] said, they presented it in a different way." *Id.* at 453. But Kronkow indicated that, if she thought one way, she would hold to that. *Id.*

Finally, another prospective juror, Ault, who was selected to sit on the jury, stated that he had hearing aids, but would be willing to ask for something to be repeated should he have difficulty hearing. *Id.* at 389. He expressed no further concern with respect to his ability to hear all the testimony and trial proceedings. *Id.* at 389–90.

The trial then proceeded, and the evidence showed that in the early morning hours of August 28, 2014, Petitioner and Simmons arrived at the apartment of K.C. Phongsavath on Richard Street in Aurora, Illinois. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 5. Petitioner and Simmons both wore masks, dark sweatshirts, jeans, and latex gloves, and they carried a BB gun. *Id.*; [16-6] at 622, 636, 670–72. Petitioner and Simmons pounded on the door of the apartment, shouting that they were Aurora Police Department officers with a warrant. *Id.* When no one answered, they forced the front door open, climbed the stairs, and then forced open the door to Phongsavath's bedroom, where she was sleeping with her boyfriend, Tyrone Davis. *Id.* at ¶¶ 4–5.

Davis testified that the intruders ordered him to give them money and jewelry. [16-6] at 672. He told them the money was outside in his car, and when Petitioner

4

and Simmons realized he was lying, they beat him repeatedly and hit him with a metal chair and the BB gun. *Id.* at 674–75. David testified that the intruders then tied him and Phongsavath up with stereo cables and a curling iron cord. *Jeffries II,* 2019 IL App (2d) 161095-U, ¶ 5. Davis observed one of the men dump over Phongsavath's bag and put her white Samsung Galaxy tablet in his back pocket. [16-6] at 675. And he saw the other take over $2,000 in cash from Davis' wallet. *Id.* at 675–76.

Davis testified that he was able to free himself from the stereo cables to scuffle with the intruders. *Id.* at 681–82. Davis attempted to flee the apartment to get help, but one of the intruders hit him over the head with a flowerpot. *Id.* at 687–89. The assailants then ran away, and Davis chased them to Richard Street. *Id.* at 689–90. During the chase, Davis saw the intruders take off their gloves and throw them down on the ground. *Id.* at 690. Davis eventually lost track of the intruders and returned to the apartment to check on Phongsavath. *Id.* at 691–92. By that time, Aurora Police Department officers and other emergency personnel had arrived at the apartment. *Id.* at 692–93. Paramedics treated Davis for his injuries, including a gash on his head, bruised ribs, broken teeth, and cuts on his hands and feet. *Id.* at 693–95.

Phongsavath also testified at trial; she indicated that the intruders entered her apartment, claiming to be from the Aurora Police Department; they broke down the door to her bedroom, demanded money and jewelry, repeatedly hit Davis, and bound both her and Davis. [16-6] at 620–32. After Davis broke free and began fighting with the intruders, Phongsavath called 911. *Id.* at 634–35. She hung up at

5

first because she was panicking, but called back right away and was told that the police were already on their way.  *Id.* at 635.  The parties stipulated that Phongsavath's phone records confirmed she made her first 911 call at 4:02:13 a.m. (which ended at 4:03:09 a.m.) and made her second call at 4:03:59 a.m.  *Id.* at 1349. The officers were dispatched at 4:02:49 a.m. *Id.*

Because Petitioner and Simmons were masked, Davis and Phongsavath could only describe their sex, build, and race. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 6. Both identified the intruders as African American; Phongsavath testified that she could see parts of the intruders' hands, *id.*, [16-6] at 637, and Davis testified that he could see parts of the intruders' necks and arms.  *Id.* at 672.

They jury also heard from Aurora Police Department Officer Peter Briddell, one of the responding officers.  Petitioner's counsel sought to elicit testimony from Briddell regarding Davis' participation in a show-up identification, and the trial judge sustained the State's outside-the-scope objection and advised counsel she would need to recall the officer to ask him about any show-up identification procedure. *Id.* Counsel did not recall the witness.

Aurora Police Department Officer Dominic Tamberelli, another responding officer, testified that he noticed a vehicle on the street as he approached Phongsavath's apartment.  *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 7.  He illuminated the vehicle with his spotlight and saw two black males in the front seats. *Id.*  The vehicle immediately fled accelerating quickly past the police car, and Officer Tamberelli pursued, his emergency lights activated. *Id.*  The police chase ended when

6

the vehicle struck a curb and crashed. [16-6] at 882–83. The driver leapt from the vehicle and escaped on foot; Officer Tamberelli did not see what happened to the passenger. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 7. When Tamberelli ran the vehicle's plate, he learned that it was registered to Petitioner. *Id.*

Officer Tamberelli explained that he climbed up the balcony of a nearby home to try and locate the fleeing driver and spotted him jumping over the fence of a home located at 415 Cedar Street. . [16-6] at 891–92. The owner of that property, Janet Faulhaber, testified that, later that morning, she saw that parts of her fence were broken, and she found the Samsung Galaxy tablet near the damaged fence. *Id.* at 1405–07; 1457–58.

The police set up a perimeter near the vehicle crash site to search for the suspects. *Id.* at 1181. They arrested Petitioner ninety minutes later, after a resident saw him emerge from his hiding place behind the shed in her yard. *Id.* at 852, 929–31. When the police searched Petitioner incident to his arrest, they found his marijuana. *Id.* at 932–33, 994–97.

The police also investigated Phongsavath's apartment and the surrounding area and found evidence consistent with the victims' testimony. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶¶ 8–9. Inside the apartment, the police found broken pieces of a BB gun and yellowish pieces of a latex glove on the staircase. [16-6] at 568. They found additional pieces of glove snagged on the damaged front doorframe and on the kitchen wall. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 8. They also found two torn latex gloves on Richard Street, across from the apartment. [16-6] at 807, 809. And,

in the car registered to Petition, they found a piece of a latex glove between the car door and the driver seat and a damaged latex glove on top of the driver's seat. *Id.* at 1048. The police also found two intact latex gloves, one white and one clear, on Taylor Street, about a block away from the apartment. *Id.* at 807–08, 840–41. The gloves on Taylor Street differed in color and appearance from those found on Richard Street. *Id.* at 840–41; *see also* [16-18] at 213, 219; [16-19] at 13, 17 (photos of latex gloves found on Taylor Street); [16-20] at 40, 44, 46 (photos of latex gloves found on Richard Street).

Forensic testing revealed that DNA extracted from a swab of one of the gloves recovered from the driver's side of Petitioner's vehicle matched Petitioner. [16-6] at 1529. DNA extracted from a swab of one of the gloves found on Richard Street matched Simmons. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 9. With respect to the piece of latex glove found on Phongsavath's staircase, DNA test results revealed a mixture of DNA profiles from at least two people with a major male profile that matched Davis, but not Petitioner. *Id.* at ¶ 8. Finally, the bag containing the glove found on the staircase contained what appeared to be a hair, but law enforcement did not submit the hair for DNA testing. [16-6] at 1099–1100; *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 8.

As part of his plea deal, Simmons testified against Petitioner at trial. He indicated that he and Petitioner were childhood friends and that, the day before the home invasion, Petitioner told Simmons he had an idea to make some quick money; the idea involved home invasion to recover drugs or money. *Id.* at 1265, 1267–68.

8

Simmons testified that he and Petitioner left Petitioner's car sometime after midnight. *Id.* at 1268, 1270. They were both dressed in black sweatshirts with a hood. *Id.* at 1269. Petitioner also brought a BB gun. *Id.* at 1272. They parked around the block, donned their masks and latex gloves, and then proceeded to the apartment. *Id.* at 1269, 1272–73. Simmons explained that he kicked in the apartment door, and they both entered, yelling "APD [Aurora Police Department], nobody move, freeze." *Id.* at 1274–75. They went up the stairs, kicked in the bedroom door, and saw a man and a woman inside. *Id.* at 1275. They demanded drugs and money from the man, and repeatedly hit him to make him come forward with those items. *Id.* at 1276–77. Simmons testified that he hit the man with his fists, and Petitioner hit him with the butt of the BB gun. *Id.* at 1276. They eventually tied up the occupants. *Id.* at 1276. Simmons took a wallet from the dresser that had about $2,000 in it, and Petitioner took a phone and put it in his back pocket. *Id.* at 1278.

Simmons explained that the man's "ties got loose," and then the three men engaged in a struggle, which then moved downstairs and outside, where Simmons and Davis fell into the bushes. [16-6] at 1280–82. Simmons said Petitioner "busted" Davis with a flowerpot, which gave Simmons a chance to get up, and then he and Petitioner both ran away toward Petitioner's car. *Id.* at 1282. Simmons jumped into the passenger seat, and Petitioner drove away. *Id.* at 1283–84. While fleeing, they passed a police car, which then chased them; the high-speed chase ended when Petitioner crashed, throwing Simmons from the car. *Id.* at 1284–85. Simmons

testified that, after the crash, he hid in the neighborhood for a while before fleeing. *Id.* at 1286–87.

During closing arguments, Petitioner's counsel emphasized a theory of misidentification, arguing the police officers' "jumped to a conclusion," which then "colored the whole course of events" surrounding the investigation of this crime. *Id.* at 1606. Counsel emphasized, for example, that the police picked up and bagged gloves found on Taylor Street, but then dismissed them because they did not fit their theory of the crime:

> These gloves that were found [on Taylor Street] that Sergeant Groom told you had been pointed out to her by one of the detectives on the scene later that day, these gloves that were collected and placed into evidence, these gloves that were determined didn't fit with the one big crime theory and so they weren't tested.

*Id.* at 1613. The State responded to Petitioner's closing in rebuttal, arguing that the police collected "a whole lot of evidence" during their investigation because they were trying to be thorough but that not everything they collected was necessarily "a piece of the puzzle for this case." *Id.* at 1646. And that was okay. In fact, the prosecutor called the gloves "a red herring"; defense counsel objected, and the trial judge sustained the objection. *Id.*

Later, in proper rebuttal to the defense closing, the State argued that the gloves collected on Taylor Street had, "nothing to do with this case." *Id.* He argued that officers took them because they were trying to make sure they did not miss anything, but the gloves did not "look anything like the gloves found on the scene," "across the street from 855 Richard," or in Petitioner's car; they were "intact," full

size gloves, one white, one clear. *Id.* at 1647. The State argued that, just because officers collected the gloves, that did not "mean they are part of the case," and that when you consider the places where the other pieces of latex glove were recovered and the fact that there were only four hands that had gloves on them, the gloves retrieved from Taylor Street "really don't fit. They don't make any sense." *Id.* at 1647–48. He suggested that the officer's decision to not test the gloves, based upon these observations, remained reasonable.

During deliberations, the jurors sent a note asking for a definition of dangerous weapon and asking about the difference between a dangerous weapon and a deadly weapon. [16-5] at 253; [16-6] at 1691. The term "dangerous weapon" appeared in the instructions related to Petitioner's home invasion and armed robbery charges, and the term "deadly weapon" appeared in the instructions related to the aggravated battery charge. *See* 720 ILCS 5/12-3.05(f)(1), 5/18-2(a)(1), 5/19-6(a)(1).[2] In consultation with the attorneys, the trial judge responded by telling the jurors they had "been tendered all applicable jury instructions on these issues"; that they had "already been provided an instruction that comments on what may be a dangerous weapon"; and that the court was "unable to provide" any additional instructions beyond the ones already given to them. [16-5] at 253; [16-6] at 1695); *see also* Ill.

---

[2] In Illinois, the crime of home invasion occurs when the defendant, "while armed with a *dangerous weapon*, other than a firearm, uses force or threatens imminent use of force upon any person or persons within the dwelling place whether or not injury occurs …" *See* 720 ILCS 5/19-6(a)(1) (emphasis added). And the crime of armed robbery occurs when the defendant "carries on or about his or her person or is otherwise armed with a *dangerous weapon* other than a firearm …" 720 ILCS 5/18-2(a)(1) (emphasis added). Aggravated battery, on the other hand, occurs when, "in committing a battery, … [the person] [u]ses a *deadly weapon* other than by discharge of a firearm …" 720 ILCS 5/12-3.05(f)(1) (emphasis added).

Pattern Jury Instr.-Criminal 4.17 (providing that an object "that is not inherently dangerous may be a dangerous weapon depending on the manner of its use and the circumstances of the case").

The jury then sent a second note asking for further clarification on the definition of "deadly weapon." [16-5] at 289; [16-6] at 1696–1703. The trial judge again advised the jurors that they had already been given the applicable instruction on the definition of dangerous weapon; that there was no jury instruction defining deadly weapon for them; and that the court was unable to provide any additional instructions. [16-5] at 289; [16-6] at 1696–1703.

The jury found Petitioner guilty on all counts except aggravated battery, *Jeffries I*, 2018 IL App (2d) 151194-U, ¶ 8, and the trial judge sentenced him to two 26-year terms of imprisonment for home invasion and armed robbery, and two 3-year terms of imprisonment for unlawful restraint and aggravated fleeing or attempting to elude a peace officer, all to be served concurrently. *Id.* at ¶ 10. The judge also imposed a jail term for the possession of cannabis conviction. *Id.*

### B.    Petitioner's Direct Appeal

Petitioner appealed, arguing that his 26-year prison sentence was excessive because the trial court overstated his criminal history and understated the mitigation factors showing his rehabilitative potential. [16-9] at 18–23. The Appellate Court rejected these arguments and affirmed his sentence. *Jeffries I*, 2018 IL App (2d) 151194-U, ¶¶ 13–18. Petitioner did not seek leave to appeal the state appellate court's decision to the Supreme Court of Illinois.

12

### C.     Petitioner's Post-Trial Motion for DNA Testing

While his direct appeal was pending, Petitioner filed a *pro se* "Motion for DNA Database Search" under 725 ILCS 5/116-5. [16-8] at 1.  Petitioner's motion requested DNA testing on the hair found on the latex glove that was recovered from Phongsavath's staircase and asked that the results of the DNA testing be processed through the DNA database and compared to his DNA profile, as well as the DNA profiles of Simmons and the two victims.  *Id.* at 2–3.  Petitioner argued in his motion that DNA testing and resulting comparison could prove his innocence. *Id.*  The trial court determined that it lacked jurisdiction to consider Petitioner's motion and thus denied it.  [16-5] at 449.

On appeal, the parties agreed that the trial court erred in finding that it lacked jurisdiction. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 15. The sole issue on appeal was thus whether Petitioner's *prima facie* showing "established that the evidence produced by testing the hair would be 'materially relevant to an assertion of actual innocence,'" which Illinois law mandates as a precondition for the court to order testing. *Id.* (quoting 725 ILCS 5/116-3(c)(1)(i)).  The Illinois Appellate Court held Petitioner could not make such a showing because the State's case against Petitioner was so strong and the reliability of the hair constituting evidence of the intruder's identity weak. *Id.* at ¶¶ 18–20. Petitioner did not seek leave to appeal the state appellate court's ruling in the Supreme Court of Illinois.

13

### D.    Postconviction Proceedings

Petitioner then pursued state postconviction relief. His *pro se* postconviction

petition raised four claims:

    (1)    Actual innocence; [16-7] at 4–20.

    (2)    Due process violations based upon:
        (a)    biased juror communications during jury selection. *Id.* at 21–22.
        (b)    the trial court's failure to define for the jurors the terms "dangerous weapon" and "deadly weapon." *Id.* at 22–23.
        (c)    the State's failure to disclose that the latex glove recovered from Phongsavath's staircase contained a strand of hair. *Id.* at 23.

    (3)    Trial counsel provided constitutionally ineffective assistance by:
        (a)    failing to challenge or excuse certain jurors. *Id.* at 24–29.
        (b)    failing to object to the State's proffer of a jury instruction on accountability. *Id.* at 29–30.
        (c)    failing to proffer a definition of "dangerous weapon" and "deadly weapon" in response to the jurors' notes. *Id.* at 30.
        (d)    failing to object to certain remarks during the State's rebuttal closing argument. *Id.* at 32-35.
        (e)    failing to present evidence that the BB-gun was not a deadly or dangerous weapon. *Id.* at 36-38.
        (f)    failing to disclose to Petitioner that a show-up identification took place and failing to elicit testimony regarding these identification procedures at trial. *Id.* at 38-40.
        (g)    failing to request a continuance for DNA testing on the strand of hair found on the latex glove. *Id.* at 41.

    (4)    Appellate counsel provided constitutionally ineffective assistance by:
        (a)    rejecting material facts contained in the record. *Id.* at 44, 61–63.
        (b)    misrepresenting material facts contained in the record. *Id.*
        (c)    being biased against Petitioner. *Id.*
        (d)    failing to raise a sufficiency of the evidence or actual innocence claim. *Id.*

After a proper review, the trial court denied the postconviction petition in all respects. [16-5] at 573–77.

Petitioner appealed, with the assistance of court appointed counsel, who filed a motion seeking leave to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551 (1987). [16-15] at 1–49. In his motion, counsel identified as potential issues for appeal all of the claims that Petitioner raised in his *pro se* petition—save for his ineffective assistance of appellate counsel claims based upon rejecting and misrepresenting material facts and bias (claims 4(a) through (c)). *Id.* at 18–19. Counsel determined, however, that none of these issues had any merit, making the appeal frivolous. *Id.* at 19–49. Petitioner responded, arguing that counsel's *Finley* assertions were not supported by the record and ignored "smoking gun evidence of his innocence." [16-16] at 1–25. The Appellate Court agreed with counsel's conclusions, however, and affirmed the denial of Petitioner's postconviction petition. [16-3] (*People v. Jeffries*, No. 2-19-0007 (Ill. App. Ct. Dec. 21, 2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)) ("*Jeffries III*")).

Undeterred, Petitioner then filed a petition for leave to appeal (PLA) to the Supreme Court of Illinois, [16-4], asserting that: (1) the state appellate court abused its discretion in affirming the denial of his postconviction petition; (2) his conviction was supported by insufficient evidence; (3) the state postconviction appellate court's forfeiture rulings were error; (4) trial counsel was ineffective in seven respects; (5) his due process rights were violated based upon: (a) biased juror communications, (b) the trial court's response to the jurors' notes during deliberations, and (c) the State's

withholding of material evidence; (6) Simmons was not a credible witness; and (7) appellate counsel was ineffective for failing to raise on direct appeal: (a) an insufficient evidence claim, (b) a juror bias claim, and (c) a claim that the trial court erred in responding to the jurors' notes during deliberations. *Id.* at 4–81. Upon review, the Supreme Court of Illinois denied his postconviction PLA. *People v. Jeffries*, No. 12-6910, 167 N.E.3d 642 (Table) (Ill. 2021).

Petitioner then initiated this matter by filing a petition seeking a writ of habeas corpus, [1]. As directed, the State answered the petition, [15]. The Court now considers and rejects Petitioner's claims below.

## II.   Discussion & Analysis

In this case, Petitioner raises the following claims:[3]

(1)    The state appellate court abused its discretion by affirming the denial of his postconviction petition. [1] at 18–21, 26–28, 36–37.

(2)    The evidence was insufficient to prove Petitioner's guilt beyond a reasonable doubt. *Id.* at 21–26, 28–33.

(3)    The state postconviction appellate court erred in finding Petitioner forfeited his claims regarding sufficiency of the evidence, juror bias, and the trial court's failure to define "dangerous weapon" and "deadly weapon." *Id.* at 38–44.

(4)    Trial counsel provided ineffective assistance by:

(a)    not challenging or excusing certain jurors. *Id.* at 61–64.

(b)    failing to object to the State's proffered jury instruction on accountability. *Id.* at 64–65.

---

[3] Respondent accurately describes Petitioner's claims in the answer but renumbers them by combining Claims 1 and 3 in a single claim (Respondent's Claim 1(a)-(b)) and including actual innocence as a standalone claim (Respondent's Claim 7). *See* [15] at 14–15.) For clarity, this Court maintains Petitioner's original numbering in this opinion. [1] at 3.

(c)    failing to proffer definitions for the terms "deadly weapon" and "dangerous weapon." *Id.* at 65.

(d)    failing to object to the State's remarks during rebuttal closing argument. *Id.* at 66–68.

(e)    failing to argue that the BB-gun was not a dangerous or deadly weapon. *Id.* at 69–70.

(f)    failing to inform Petitioner and elicit testimony during trial that Davis participated in a show-up identification. *Id.* at 70–71.

(g)    failing to request a continuance to conduct DNA testing on the strand of hair found with the latex glove recovered from Phongsavath's staircase. *Id.* at 72.

(5)    Due process violations based upon:

(a)    the jurors' biased communications during jury selection. *Id.* at 74–75.

(b)    the trial court's failure to define for the jury the terms "deadly weapon" and "dangerous weapon." *Id.* at 75–76.

(c)    the State's withholding of evidence that a strand of hair was found with the latex glove recovered from the staircase. *Id.* at 76.

(6)    Simmons was not a credible witness. *Id.* at 77–81.

(7)    Appellate counsel provided ineffective assistance by failing to argue on direct appeal:

(a)    a sufficiency of the evidence claim. *Id.* at 38, 41–44.

(b)    a juror bias claim. *Id.* at 38–40, 41–44

(c)    a claim that the trial court erred in not defining "dangerous weapon" and "deadly weapon" for the jurors. *Id.* at 40–44.

17

In addition to these claims, Petitioner asserts that he is actually innocent and provides a self-executed affidavit in support of this argument. *Id.* at 17–20, 25, 32.

Respondent contends that Petitioner is not entitled to habeas corpus relief on any of his claims because they are either non-cognizable, procedurally defaulted, or meritless. As explained below, the Court agrees that: Claims 1 and 3 are non-cognizable; Claims 2, 5(a), 5(b), 6, 7(b), and 7(c) are procedurally defaulted; and Claims 4(a), 4(b), 4(c), 4(d), 4(e), 4(f), 4(g), 5(c) and 7(a) lack merit.

## A.    Non-Cognizable Claims

Respondent argues that Claims 1 and 3, which raise arguments concerning the state appellate court's ruling on postconviction appeal, present issues that are not cognizable on federal habeas corpus review. [15] at 37. This Court agrees.

Section 2254 habeas corpus relief is only available to state prisoners who can establish that their incarceration violates the Constitution, law, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *McCarthy v. Pollard*, 656 F.3d 478, 482–83 (7th Cir. 2011); *see also* 28 U.S.C. § 2254(a). Thus, claims that a state court erred in applying its own laws are not cognizable on habeas corpus review. *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002) (citing *Estelle*, 502 U.S. at 67–68.

Turning first to Claim 1, Petitioner argues that the state postconviction appellate court abused its discretion in affirming the denial of his *pro se* postconviction petition. [1] at 18–21, 26–28, 36–37. To the extent Petitioner is alleging an improper use of the discretion that state law affords Illinois courts in

deciding state postconviction matters, his claim is non-cognizable. *See Arnold v. Dittmann*, 901 F.3d 830, 835 n.3 (7th Cir. 2018) (claim that the state court misapplied and/or abused its discretion in applying state law was non-cognizable on habeas review); *Beachem v. Williams*, 351 F. Supp. 2d 793, 809 (N.D. Ill. 2004) ("abuse of discretion granted to a state court by state law does not implicate the federal Constitution") (citation omitted).

As discussed further below, when considering challenges to state court decisions on federal habeas corpus review, this Court asks not whether the state court abused its discretion, but whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "an unreasonable determination of facts." § 2254(d)(1)-(2). To the extent Claim 1 challenges the state appellate court's ruling on these grounds, the Court addresses such claims in the latter half of its opinion. *See infra* p. 29-49. Petitioner's "abuse of discretion" argument remains non-cognizable, however, and thus, this Court denies Claim 1.

In Claim 3, Petitioner challenges the state appellate court's ruling that he forfeited his sufficiency of the evidence and juror bias claims and his claim that the trial court erred in responding to the jurors' notes during deliberations. [1] at 38–44. Forfeiture, however, concerns Illinois's procedural rules and thus implicates an issue of state law that is not cognizable on federal habeas corpus review. *See Estelle*, 502

U.S. at 67–68; *Coleman v. O'Leary*, 845 F.2d 696, 699 (7th Cir. 1988). The Court denies Claim 3.[4]

Beyond Claims 1 and 3, Respondent argues that Petitioner's actual innocence argument, woven throughout his petition, *see* [1] at 17–20, 25, 32, is non-cognizable. [15] at 37–38.

Neither the Seventh Circuit, nor most other circuits, have recognized actual innocence as an independent constitutional claim. *See Cal v. Garnett*, 991 F.3d 843, 851 (7th Cir. 2021) (citing cases from the Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits). And the Supreme Court has yet to hold that "actual innocence claims, standing alone—separate and apart from any constitutional error—could support habeas relief." *Id*. at 850 (collecting cases); *see also Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (federal habeas corpus review is limited to principles "clearly established … by the Supreme Court of the United States") (internal quotation marks omitted). Rather, the law "treats a showing of 'actual innocence' as a way for prisoners to overcome procedurally defaulted and time-barred habeas claims." *Cal*, 991 F.3d at 850.

Thus, to the extent Petitioner asserts a freestanding actual innocence claim, Respondent is correct that it is not cognizable. The Court will, however, consider (and rejects) this argument below in the context of procedural default.

---

[4] Petitioner also argues in Claim 3 that any forfeiture remains attributable to appellate counsel, [1] at 41–44. The Court considers this argument below, in connection with its consideration of whether Petitioner can excuse any procedural defaults under the cause-and-prejudice exception.

### B.     Procedural Default

Respondent next contends that the law precludes this Court from reviewing the merits of Claims 2, 5(a)-(c), 6, and 7(b)-(c) because these claims are procedurally defaulted under either the fair presentment doctrine or the independent and adequate state ground doctrine. [15] at 38–40.  The Court agrees with Respondent's procedural default arguments, except for Claim 5(c).

A habeas corpus claim can be procedurally defaulted in two ways.  The first occurs when a prisoner fails to fully exhaust state court remedies for his federal claim, and he no longer has the ability to do so under the state's procedural laws. *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016); *see also* 28 U.S.C. § 2254(b)(1)(A) (state prisoners must "exhaust the remedies available in the courts of the State" before seeking federal habeas relief).  To satisfy the exhaustion requirement, state prisoners must fairly present their federal claims through one complete round of state-court review, either on direct appeal or in postconviction proceedings. *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  In Illinois, this includes fairly presenting the claims in a PLA to the state supreme court. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018) (citing *Boerckel*, 526 U.S. at 845–46).  A habeas petitioner who has "exhausted state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Lewis*, 390 F.3d at 1026.

The second type of procedural default "comes from the independent and adequate state ground doctrine." *Thomas*, 822 F.3d at 384 (citing *Coleman v.*

*Thompson*, 501 U.S. 722, 729–30 (1991)). Federal courts "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729). A state law ground is "independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case," and it is "adequate when it is a firmly established and regularly followed state practice at the time it is applied." *Thompkins v. Pfister*, 698 F.3d 976, 986 (7th Cir. 2012).

### 1. Independent and Adequate State Ground Doctrine

Taking the latter type of procedural default first, Respondent argues that Claims 2, 5(a), 5(b), and 6 are procedurally defaulted because the state appellate court on postconviction appeal concluded that Petitioner forfeited these claims by failing to raise them on direct review. [15] at 40.

When a state "refuses to adjudicate a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that will normally qualify as an independent and adequate state ground for denying federal review." *Flint v. Carr*, 10 F.4th 786, 794 (7th Cir. 2021) (quoting *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009)); *see also Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996) ("failure to present a claim at the time, and in the way, required by the state is an independent state ground of decision, barring review in federal court").

In Illinois, "failure to raise a claim which could have been addressed on direct appeal is a procedural default which results in a bar to consideration of the claim's

merits in a post-conviction proceeding." *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) (quoting *People v. Erickson*, 641 N.E.2d 455, 458 (1994)).[5] A finding of forfeiture by the state postconviction court "is enough to establish an adequate and independent state ground," precluding federal habeas corpus review. *Id.*

### a. The State Court Denied Claims 2 and 6 on Independent and Adequate State Grounds

Petitioner's Claims 2 and 6 challenge the sufficiency of the State's evidence to prove his guilt beyond a reasonable doubt (Claim 2) and, relatedly, Simmons' credibility (Claim 6). [1] at 21–26, 28–33.  Although Petitioner separates the points into two claims, his credibility challenge appears to be a sub-argument of his sufficiency of the evidence claim.  *See* [1] at 81 ("Simmons's testimony does not carry with it an absolute conviction of its truth. Wherefore, petitioner prays that this Honorable Court will vacate the finding of guilty in this cause … and find that the evidence was insufficient…). The Court therefore addresses the two issues in combination.

The last state court to address Petitioner's sufficiency arguments was the state appellate court on postconviction appeal. *See Jeffries III*, No. 2-19-0007, ¶¶ 7–8. In ruling on Petitioner's sufficiency challenge, the state appellate court credited the forfeiture issues raised by counsel. *Jeffries III*, No. 2-19-007, ¶ 7 ("Counsel argues that because the issue could have been raised on direct appeal but was not, it is forfeited."). Petitioner's sufficiency claim, including his argument regarding

---

[5] Illinois courts often use the terms, "forfeit," "waive," and "procedural default" interchangeably to describe instances in which an issue could have been raised on direct appeal but was not and is therefore barred from postconviction review. *See People v. Blair*, 831 N.E.2d 604, 614–15 (Ill. 2015).

Simmons' credibility, concerned matters that he would have been aware of on direct appeal. *See Sturgeon*, 552 F.3d at 611. The state appellate court held, "even assuming that the issue could be raised at this time, there is no reasonable basis for arguing that the evidence was insufficient." *Jeffries III*, No. 2-19-007, ¶ 8. But the court's alternative merits holding (which properly characterized the overwhelming evidence of guilt) does not negate its forfeiture finding (which is dispositive here). *See Whyte v. Winkleski*, 34 F.4th 617, 627 (7th Cir. 2022) ("Even if the court also rejected the claim as meritless, our review is foreclosed when adequate and independent state law grounds are sufficient to resolve the dispute."). *See also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). Thus, based upon the state appellate court's forfeiture finding, Claims 2 and 6 remain procedurally defaulted.[6] *Sturgeon*, 552 F.3d at 611.

---

[6] As an aside, Claims 2 and 6 also lack merit. On a sufficiency challenge, the Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Saxon v. Lashbrook*, 873 F.3d 982, 987–88 (7th Cir. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A federal court's habeas review of sufficiency claims is subject to two levels of judicial deference: first, the state appellate court defers to the jury's verdict; and second, the federal habeas court defers to the state appellate court's decision and may only overturn it if the appellate court's finding was objectively unreasonable. *See Parker v. Matthews*, 567 U.S. 37, 43 (2012); *Saxon*, 873 F.3d at 988. Petitioner cannot overcome this high bar as the record included overwhelming evidence of guilt. The evidence at trial demonstrated that: (1) the getaway car was registered to Petitioner; (2) Phongsavath's Samsung Galaxy tablet was found near the place where Petitioner was seen jumping over a fence; (3) latex gloves like the ones worn during the home invasion were found in Petitioner's car and matched Petitioner's DNA; and (4) Petitioner was found hiding in a nearby yard a short time after the police chase. Simmons, who pled guilty, identified Petitioner as his partner in crime, and the jury found him to be credible; "attacks on witness credibility," like the one Petitioner makes, remain "insufficient to sustain a challenge to the sufficiency of the evidence." *United States v. Elder*, 840 F.3d 455, 460 (7th Cir. 2016).

### b. The State Court Denied Claims 5(a) and 5(b) on Independent and Adequate State Grounds

Claims 5(a) and 5(b) are procedurally defaulted for the same reasons as Claims 2 and 6. In addressing these claims on postconviction appeal, the state appellate court concluded that Petitioner could have raised his due process claims regarding juror bias (Claim 5(a)) and the trial court's response to the jury's notes during deliberations (Claim 5(b)) on direct appeal, but he did not. *Jeffries III*, No. 2-19-0007, ¶¶ 9, 10. His claims, the state appellate court held, were therefore forfeited. *Id.* As explained above, the state court's discussion of the merits of these claims does not affect the finding of forfeiture, *see Whyte*, 34 F.4th at 627, which constitutes an independent and adequate state ground resulting in the procedural default of Claims 5(a) and 5(b).[7] *See Sturgeon*, 552 F.3d at 611.

### 2. The Fair Presentment Doctrine

### a. Claims 7(a) and 7(b) Were Not Fairly Presented Through One Complete Round of State-Court Review

Turning to the fair presentment doctrine, Respondent contends that two of Petitioner's ineffective assistance of appellate counsel claims, Claims 7(b) and 7(c),

---

[7] Claims 5(a) and 5(b) also lack merit. As to Claim 5(a), due process entitles a criminal defendant to an impartial jury, and requires the trial court, if it becomes aware of a possible source of bias, to determine the circumstances, the impact on the jurors, and the prejudicial effect. *Oswald v. Bertrand*, 374 F.3d 475, 477–78 (7th Cir. 2004). Petitioner contends that some of the jurors communicated amongst themselves or with the parties' attorneys during a break in the jury selection process, and that the trial court's post-break instruction demonstrated that those communications were biased. But the trial court instructed the jurors that they must base their decision "upon the facts presented, not upon whether you like somebody or don't like somebody" as part of the standard instruction that attorneys may not interact with or talk to members of the jury during the trial. [16-6] at 474. There is no indication in the record that the instruction was prompted by any conversation or incident (biased or otherwise); Petitioner's claim thus remains unsupported.

are procedurally defaulted because they were not presented through one complete round of state-court review either on direct appeal or in postconviction proceedings. [15] at 39.

Claim 7(b) asserts an ineffective assistance of appellate counsel claim based upon the failure to raise a juror bias issue on direct review, and Claim 7(c) claims ineffective assistance of appellate counsel based upon the failure to argue that the trial court erred by not defining the terms "deadly weapon" and "dangerous weapon" for the jury. [1] at 38–44. Petitioner raised each of these claims for the first time in his postconviction PLA, [16-4] at 35–41, which fails to satisfy the fair presentment doctrine. *See Lewis*, 390 F.3d at 1031 (Noting that both the United States Supreme Court and the Seventh Circuit have "held that an appellant does not fully and fairly present a federal claim to the state courts when he raises that claim for the first time … in a petition asking the state supreme court to grant him leave to appeal."). Claims 7(b) and 7(c) remain procedurally defaulted.[8] *See Boerckel*, 526 U.S. at 845.

---

Further, as to Claim 5(b), trial courts exercise discretion "in administering trials and managing jury deliberations." *United States v. Protho*, No. 17 CR 00827, 2021 WL 1020999, at \*13 (N.D. Ill. Mar. 17, 2021), *aff'd*, 41 F.4th 812 (7th Cir. 2022), *cert. denied*, 214 L. Ed. 2d 264, 143 S. Ct. 465 (2022). Though this discretion is tempered by the special care courts must take not to intrude on the jury's fact-finding function, *see id.*, the trial court's response to the jury's notes during Petitioner's trial did not override or interfere with the jurors' independent judgment, but properly referred the jurors to the original jury instructions, which were sufficient. *See infra* at 36–38. In any event, the trial court's responses did not prejudice Petitioner, as the evidence of his guilt was overwhelming. *See Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001) (to rise to the level of a due process violation, "the error must have produced a significant likelihood that an innocent person has been convicted").

[8] Petitioner satisfied the fair presentment requirement for one of his ineffective assistance of appellate counsel claims (Claim 7(a)), but such presentment cannot save Claims 7(b) and 7(c). Although ineffective assistance of counsel is a single ground for habeas corpus relief, Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel allegation to preserve the respective argument. *Pole v. Randolph*, 570 F.3d 922, 934–35 (7th Cir. 2009).

### b.    Claim 5(c) is Not Procedurally Defaulted

Respondent likewise argues that Claim 5(c) is procedurally defaulted.  Claim 5(c) asserts Petitioner's third due process argument regarding the State's alleged withholding of the hair contained in the evidence bag with the latex glove that was recovered from Phongsavath's staircase.  *See* [1] at 76.  Respondent acknowledges that this claim was fairly presented to the state appellate court in postconviction appellate counsel's *Finley* motion but argues that it was not fairly presented as a federal constitutional due process claim to the state trial court in Petitioner's *pro se* postconviction petition or to the state supreme court in his *pro se* PLA.[9] [15] at 39– 40.  The Court disagrees,

Courts typically consider four factors when determining whether a habeas corpus petitioner fairly presented his constitutional claim to the state courts: "(1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of fact that is well within the mainstream of constitutional litigation." *Wilson v. Briley*, 243

---

[9] Respondent argues that Petitioner failed to fairly present all three of his due process claims (Claims 5(a), 5(b), and 5(c)) through one complete round of state-court review. [15] at 39–40. Having already determined that Claims 5(a) and 5(b) are procedurally defaulted under the independent and adequate state ground doctrine, the Court considers fair presentment as to Claim 5(c) only.

F.3d 325, 327 (7th Cir. 2001) (collecting cases). A "mere passing reference to a constitutional issue," will not suffice. *Id.* at 738.

Consideration of the above factors shows that Petitioner fairly presented Claim 5(c) to each level of state-court review. First, Petitioner raised this claim in his *pro se* postconviction petition, [16-7] at 21–23, as indicated by, among other things, his use of terms such as "the right to due process," "unfair trial," "prejudice," and "fundamental unfairness," which clearly call to mind the Fourteenth Amendment right to due process of law. Petitioner contended that his "right to due process of the law was violated by" the prosecutor, who allegedly withheld material evidence (*i.e.*, the strand of hair from the staircase), thereby preventing him from being able to conduct DNA testing. [16-7] at 23. Indeed, the trial court recognized Petitioner's argument as a due process claim, [16-5] at 574, 576, undermining Respondent's fair presentment argument here. *See Malone v. Walls*, 538 F.3d 744, 756 (7th Cir. 2008) ("when it is clear from the state court's decision that it not only recognizes the petitioner's federal claim, but also resolves the claim on the merits, engaging in our typical fair presentment assessment is unnecessary").

Respondent concedes that Petitioner presented Claim 5(c) to the state appellate court (by way of counsel's *Finley* motion). [15] at 39. And Petitioner reasserted his due process argument regarding the prosecutor's purported withholding of the hair strand in his *pro se* postconviction PLA. [16-4] at 74–76. Each time Petitioner presented his due process argument to the state courts, he explained the legal basis of his claim using language evocative of the Due Process Clause and

the Fourteenth Amendment, and he provided a thorough explanation of the claim's factual basis. As a result, the Court finds that Petitioner fairly presented Claim 5(c) and rejects Respondent's procedural default argument as to this claim.

### 3. Procedural Default Exceptions

Having determined that Petitioner procedurally defaulted Claims 2, 5(a), 5(b), 6, 7(b), and 7(c), this Court may not consider the merits of these claims unless Petitioner can establish one of the two exceptions to procedural default. *See Thomas*, 822 F.3d at 386. Federal habeas corpus review of a procedurally defaulted claim is unavailable unless "the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that the failure to consider the claims will result in a fundamental miscarriage of justice.'" *Id.* (quoting *Coleman*, 501 U.S. at 750). Neither exception applies here.

As to cause and prejudice, cause is an "objective factor, external to [Petitioner] that impeded [his] efforts to raise the claim in an earlier proceeding." *Johnson v. Foster*, 786 F.3d 501, 505 (7th Cir. 2015) (citing *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). Prejudice means, "an error which so infected the entire trial that the resulting conviction violates due process." *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010) (quoted case omitted).

Petitioner argues that the forfeiture of his sufficiency argument (Claims 2 and 6) and due process claims (Claims 5(a) and 5(b)) was due to the ineffective assistance of appellate counsel, who challenged only his sentence on direct appeal and did not raise any challenges to his convictions. [1] at 41–44. Though counsel's ineffectiveness in failing to properly preserve a claim for review in state court can constitute "cause" to excuse a procedural default, the ineffective assistance of counsel claim must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner challenged appellate counsel's failure to raise his due process claims regarding juror bias and the trial court's response to the jurors' notes only in his postconviction PLA. He thus did not properly preserve any ineffective assistance of counsel argument to excuse the default of Claims 5(a) and 5(b).

Petitioner did properly preserve his ineffective assistance of appellate counsel claim as to his sufficiency of the evidence argument that he presents here as Claim 7(a), which could, in theory, constitute "cause" for considering whether to excuse the default of the underlying sufficiency arguments raised in Claims 2 and 6. But, as discussed below, the ineffective assistance of appellate counsel argument remains meritless and thus cannot excuse Petitioner's default of Claims 2 and 6. *See Duncan v. Hathaway*, 740 F. Supp. 2d 940, 950 (N.D. Ill. Aug. 11, 2010) ("Because petitioner's claims of ineffective appellate counsel are either defaulted or are meritless, they do not support cause for excusing the default of his remaining claims.").

This leaves the fundamental miscarriage of justice (actual innocence) exception. To show actual innocence to excuse a default, Petitioner must demonstrate that "in light of … new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (citing *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). To make a credible claim of actual innocence, Petitioner must present new, reliable evidence that was not presented at trial—such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324). The standard is "demanding" and "seldom met." *Id.* at 386 (citing *House*, 547 U.S. at 538). The standard requires the proffer of adequate evidence, such as "documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'" *McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)). Petitioner offers no such evidence.

Actual innocence requires the proffer of evidence that is both new and credible, *Wilson v. Cromwell*, 58 F.4th 309, 320 (7th Cir. 2023), but Petitioner simply offers a rehash of the evidence offered to, and considered by, the jury that convicted him, arguing that the location of the Samsung Galaxy tablet, Simmons' lack of credibility, and the 911 phone call records all show that he could not have been at Phongsavath's apartment at the time of the crime. [1] at 21–32, 77–81.

Petitioner also presents a self-executed affidavit in which he swears that he did not commit the crime and that he was merely driving his car near the scene, smoking marijuana, and then fled from police because he did not have the money to bail himself out of jail. [1] at 17. But, as the Seventh Circuit has recognized, such "self-serving," "eleventh hour" affidavits, "containing facts not alleged at trial and accompanied by no reasonable explanation for the delay are inherently suspect." *McDowell*, 737 F.3d at 484. This is especially true in light of the volume of evidence establishing Petitioner's guilt: police saw Petitioner's car near Phongsavath's apartment immediately following the home invasion; Petitioner led the police on a high-speed chase that only ended once the car crashed; Petitioner was seen jumping over a fence to evade police; Phongsavath's Samsung Galaxy tablet was found near the place where Petitioner jumped the fence; police found Petitioner hiding in the yard of a home in Phongsavath's the neighborhood shortly after the home invasion; police found pieces of latex glove like the ones the intruders wore in Petitioner's car and the gloves matched Petitioner's DNA; and, most critically, Simmons testified that he and Petitioner forced their way into Phongsavath's apartment and committed the crimes. Petitioner's affidavit falls short of the showing necessary to trigger the fundamental miscarriage of justice exception. In short, Petitioner is guilty of the violent crimes charged and the jury's finding of guilt remains just. As a result, the Court finds that Claims 2, 5(a), 5(b), 6, 7(a), and 7(b) remain defaulted and, accordingly, denies them.

### D.    Claims Reviewed on the Merits

Having completed its review of the preliminary non-cognizable and procedural-default issues, the Court considers the merits of Petitioner's remaining claims: Petitioner's ineffective assistance of trial counsel claims (Claims 4(a)-4(g)), his due process claim (Claim 5(c)), and his claim for ineffective assistance of appellate counsel based upon the failure to raise a sufficiency of the evidence argument on direct review (Claim 7(a)).  As discussed in detail below, none of these claims has merit.

The Antiterrorism and Effective Death Penalty Act (AEDPA) bars federal habeas relief for claims adjudicated on the merits in state court unless the state court decision "(1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Armfield v. Nicklaus*, 985 F.3d 536, 540–41 (7th Cir. 2021) (quoting 28 U.S.C. § 2254(d)(1)–(2)).  This "difficult to meet" and "highly deferential standard" reflects the view that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021).  Thus, a state prisoner may not obtain habeas relief on his claim unless he demonstrates the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### 1. Claim 4: Ineffective Assistance of Trial Counsel Claims

In Claim 4, Petitioner argues that his trial attorney was ineffective for: (a) failing to challenge or excuse certain jurors; (b) failing to object to the jury instruction on accountability; (c) failing to proffer definitions for "dangerous weapon" and "deadly weapon;" (d) failing to object to certain remarks during the State's rebuttal closing argument; (e) failing to present evidence that the BB gun was not a deadly or dangerous weapon; (f) failing to elicit testimony regarding the show-up identification; and (g) failing to request a continuance for DNA testing. [1] at 61–72.

The relevant decision for this Court's consideration is the decision of the state appellate court on postconviction appeal, as that was the last state court to address Petitioner's ineffective assistance arguments in a decision on the merits. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011). The state appellate court carefully reviewed each of Petitioner's claims of ineffective assistance of trial counsel and properly concluded that none had merit. *See Jeffries III*, No. 2-19-0007, ¶¶ 13–20. This conclusion was neither contrary to, nor an unreasonable application of Supreme Court precedent. *See* § 2254(d)(1).

As an initial matter, the state appellate court cited the correct legal standard governing ineffective assistance of counsel claims, noting that, to establish a Sixth Amendment violation of ineffective assistance of counsel, "a defendant must establish that counsel's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.'" *Jeffries III*, No. 2-19-0007, ¶ 14 (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984)).

Moreover, the state appellate court's decision was not unreasonable. *Id.* Because *Strickland* "is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). On federal habeas corpus review, *Strickland*'s deferential standard is combined with § 2254(d)(1)'s deferential standard, thereby resulting in a "doubly deferential" standard for evaluating the state appellate court's opinion which, as explained below, Petitioner cannot overcome. *Knowles*, 556 U.S. at 123.

### a. Claim 4(a): Alleged Failure to Excuse Certain Jurors

Petitioner first claims that his trial attorney was constitutionally ineffective for failing to challenge or excuse six jurors during jury selection. [1] at 61–64. More specifically, he claims counsel should have challenged: jurors Rapacz, Figgins, and Gensler because they were all victims of crimes similar to those charged; jurors Pauley and Kronkow, because their responses during jury selection indicated they were "unsure of how they would make their judgment;" and juror Ault, because of his hearing impairment. *Id.* The state appellate court rejected Petitioner's arguments, holding that counsel reasonably determined that these jurors would be able to perform their duties on the jury, and that Petitioner failed to demonstrate that any of these individuals showed actual bias. *Jeffries III*, No. 2-19-0007, ¶ 14.

The constitutional standard of fairness "requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'" *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). But "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Rather, "due process means a jury capable and willing to decide the case solely on the evidence before it…" *Id.*; *see also Murphy*, 421 U.S. at 800 (citing *Irvin*, 366 U.S. at 723) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). Although a "juror's assurance that he is equal to the task cannot be dispositive of the accused's rights," it is the defendant's burden "to demonstrate the actual existence of such an opinion in the mind of the juror as will demonstrate the presumption of partiality." *Whitehead v. Cowan*, 263 F.3d 708, 720 (7th Cir. 2001) (citing *Murphy*, 421 U.S. at 800) (quoting *Irvin*, 366 U.S. at 723)).

First, Petitioner contends that his trial attorney should have challenged or excused the three jurors who indicated they were victims of similar crimes. Specifically, he points to Rapacz, whose parents' home was vandalized when he was six years old; Figgins, who stated she was the victim of a theft that occurred in her house when she was not home; and Gensler, who indicated that her car had been broken into many years ago. [16-6] at 398–99, 480–81, 489–90.

Victims of crime are not presumed to be biased. *United States ex rel. Davis v. Gramley*, No. 98 C. 1452, 2008 WL 4378832, at *4 (N.D. Ill. Mar. 26, 2008). Rather, an inference of "implied bias" arises only in "exceptional circumstances." *Hunley v.*

*Godinez*, 975 F.2d 316, 318–20 (7th Cir. 1992). Though an example of such an "extreme" situation may include cases where the prospective juror has been the victim of a crime similar to the one at issue in the trial, Petitioner's case does not present the type of rare circumstance that would call for application of the implied bias doctrine. *See e.g., id.* at 319–20 (implied bias presumed where facts of defendant's case, *i.e.,* unforced entry into victim's apartment to steal resulting in murder of victim upon her unexpected arrival home, were "profoundly similar" to jurors' experience during sequestration where burglar made unforced entry with a pass key into jurors' housing to steal).

Petitioner's crimes involved forced entry into an apartment in the middle of the night, posing as police officers, tying up the occupants, beating a victim, and stealing items from the home. The incidents that these three jurors described during jury selection—vandalism that occurred during childhood, a theft that occurred when no one was home, and breaking into a vehicle—differ in material ways from the crimes with which Petitioner was charged. Because the jurors experiences were not "profoundly similar" to Petitioner's victims' experiences, the implied bias doctrine remains inapplicable.

Further, the record makes clear that all three of these jurors were asked whether the incidents they experienced would, in any way, affect their ability to be a fair and impartial juror, or had otherwise left a "bad taste" in their mouths about the criminal justice system. [16-6] at 399–400, 481, 490. And all three confirmed that

they could be fair and impartial despite their experiences. *Id.* The state appellate court thus reasonably rejected Petitioner's *Strickland* claim as to these jurors.

Petitioner also argues that trial counsel should have challenged Pauley and Kronkow. He takes issue with their responses that demonstrated a willingness to consider other opinions when forming their own conclusions about his guilt or innocence. [1] at 63–64. He further challenges Pauley's responses to a series of questions relating to the State's burden, contending she demonstrated reluctance to sign a not guilty verdict if the State failed to meet its burden. *Id.* at 62–63. But neither juror's responses demonstrate bias. Rather, both Pauley and Kronkow expressed an openness to hearing what other jurors had to say when forming their conclusions, [16-6] at 451) ("Well, sometimes people can explain things in a different way and then you would agree with them…"); *id.* at 453 (explaining her opinion would not be swayed by somebody else's "unless … they presented it a different way"), and both confirmed they would stick to their own conclusion if they did not agree with others and saw things differently. *Id.* at 450, 453. This tracks the instruction Illinois criminal courts provide to deadlocked juries:

> In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Ill. Pattern Jury Instr.-Criminal 26.07; *see also People v. Primm*, 289 N.E.2d 601, 608–10 (1987).

38

With respect to Pauley's responses regarding her verdict, a review of the record demonstrates that she was initially confused by the form of the question, not unsure of her ability to follow the law and the court's instructions:

> Mr. Tatman: Would you hold the state to their burden that they need to prove this case beyond a reasonable doubt before signing a guilty verdict?
>
> [Pauley]: Yes.
>
> Mr. Tatman: If you felt they did not meet their burden, would you sign the not guilty verdict?
>
> [Pauley]: If they didn't meet it?
>
> Mr. Tatman: If they did not meet their burden, would you sign a not guilty verdict?
>
> [Pauley]: If they didn't meet the burden, I don't know if I could sign it.
>
> Mr. Tatman: You don't know if you could sign a guilty verdict?
>
> [Pauley]: If they didn't prove beyond a reasonable doubt, I don't think I could do it?
>
> Mr. Tatman: Okay. You don't think you could do what?
>
> [Pauley]: I don't think I could sign anything unless I knew it was the right thing to do.

*Id.* at 447–48.

Petitioner also claims his counsel should have challenged juror Kronkow because she said she wished people "would make better choices," [1] at 63–64. But that statement (which was not evidence of an improper bias) was made by a different juror, for whom defense counsel exercised a peremptory challenge. [16-6] at 455, 462.

Finally, Petitioner challenges the seating of Ault as one of the jurors, contending counsel should have excused him because he wore hearing aids. [1] at 62. But "evidence indicating a hearing impairment" does not "per se disqualify a juror and impeach a verdict." *United States v. Saadeh*, 61 F.3d 510 (7th Cir. 1995) (citing *Commonwealth v. Brown*, 332 A.2d 828 (1974); *Wisconsin v. Turner*, 521 N.W.2d 148 (1994)). In *Saadeh*, the Seventh Circuit rejected the petitioner's argument that a juror's hearing difficulties denied defendants the right to a fair trial, finding there was no evidence that the juror was unable to hear the evidence proffered at trial or during jury deliberations. *Id.* at 525. So too here. Ault indicated that he had no difficulty hearing if he is directly facing the speaker, and that he would raise his hand to have something repeated if he could not hear. [16-6] at 389. Petitioner offers nothing but speculation to suggest that Ault missed anything at trial. Absent some evidence that Ault's hearing impairment affected his ability to hear or meaningfully participate in the trial, the state appellate court reasonably rejected this claim.

For all the reasons above, the Court denies Claim 4(a) because it lacks merit.

### b. Claim 4(b): Alleged Failure to Object to the Court's Accountability Jury Instruction

Petitioner next contends that his trial attorney's failure to object to the jury instruction on accountability constitutes ineffective assistance of counsel. [1] at 64–65. Here, Petitioner argues that he was prejudiced by his counsel's failure to object because the indictment did not charge him based on a theory of accountability. *Id.*

In Illinois, it is well-established that "a person charged as a principal can be convicted upon evidence showing that he was in fact only an aider or abetter."

*Ashburn v. Korte*, 761 F.3d 741, 758 (7th Cir. 2014) (quoting *People v. Doss*, 426 N.E.2d 324, 327 (Ill. App. Ct. 1981)). "That is 'because accountability is not a separate offense but merely an alternative manner of proving a defendant guilty of the substantive offense'" *Id.* (quoting *Doss*, 426 N.E.2d at 327); *see also People v. Ceja*, 789 N.E.2d 1228, 1247 (Ill. 2003).

Given Illinois' pleading practice, the state appellate court determined that the instruction was proper, and counsel thus lacked a meritorious objection to it; as a result, the failure to object did not constitute ineffective assistance. *Jeffries III*, No. 2-19-0007, ¶ 15. This Court "cannot disagree with a state court's resolution of an issue of state law." *Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law … binds a federal court sitting in habeas corpus"); *Estelle*, 502 U.S. at 67–68 ("it is not the province of a federal habeas corpus court to reexamine state-court determinations on state-law questions"). And Petitioner's counsel cannot be found to have rendered ineffective assistance for failing to raise what would have been a losing objection at trial. *See Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018) (citing *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996)) ("an attorney is not ineffective for failing to raise a meritless argument"). The Court thus denies Claim 4(b) because it lacks merit.

### c.    Claim 4(c): Failure to Proffer Definition of "Deadly Weapon" and "Dangerous Weapon"

Petitioner's third ineffective assistance of trial counsel claim faults his attorney for failing during deliberations to provide an answer that clarified for the

jurors the definition of "deadly weapon" and "dangerous weapon." [1] at 65. In rejecting Petitioner's argument, the state appellate court concluded that the jury had "received the Illinois Pattern Jury Instruction defining those terms" and that a "more thorough definition of those terms" would not have altered the outcome of trial. *Jeffries III*, No. 2-19-0007, ¶ 16. The state appellate court further noted that the term "deadly weapon" pertained to the aggravated battery charge of which Petitioner was acquitted. *Id.*

The contention that trial counsel offered no response to the jurors' inquiries regarding the definitions of "deadly weapon" and "dangerous weapon" is also refuted by the record. Petitioner's counsel suggested that the trial court advise the jurors that they had been provided with all the instructions that they were to use to decide the case, and that there was no specific jury instruction for the definition of "deadly weapon." [16-6] at 1692–93, 1703. It was not unreasonable for counsel to proffer such a response; indeed, the Seventh Circuit has observed that, in response to a jury question, "referring a jury back to [the original] instructions can be the most prudent course." *Emerson v. Shaw*, 575 F.3d 680, 685–86 (7th Cir. 2009).

In any event, this Court has no reason to believe that a different response would have affected the outcome of the case. *Id.* at 686 (noting that demonstrating *Strickland* prejudice in this context requires petitioner to show a reasonable probability that "effective" counsel could have altered the judge's response to the jury's question, *and* a reasonable probability that the altered response would have resulted in a different outcome).

42

In Illinois, the term "dangerous weapon," which was relevant to Petitioner's home invasion and armed robbery charges, is derived from common law. *Jefferson v. Hutchinson*, No. 14 C 5386, 2016 WL 7157356, at *5 (N.D. Ill. Dec. 8, 2016) (citing *Illinois v. Hernandez,* 51 N.E.2d 794, 799 (Ill. 2016)). What "constitutes a 'dangerous weapon' is a question for the finder of fact and includes 'not only objects that are *per se* dangerous, but objects that are used or may be used in a dangerous manner. … Even everyday objects can be dangerous weapons for purposes of the armed-robbery statute when they are used 'in a manner likely to cause serious injury.'" *Jefferson*, 2016 WL 7157356, at *5 (quoting *Hernandez*, 51 N.E.2d at 799).

In Petitioner's case, there was uncontroverted evidence that, during the course of the home invasion and armed robbery, Petitioner and Simmons attacked Davis by striking him with a metal chair, a BB gun, and a large flowerpot, causing him to sustain, among other injuries, a gash on his head.  [16-6] at 674–75, 689, 694, 1276. Based upon the manner in which these objects were used and the injuries they caused, the jury could have reasonably concluded any one of them constituted a dangerous weapon (a common sense term), as they all fell within the common law definition of the term. There is thus no reasonable probability that an alternate response or further elucidation as to the definition of "dangerous weapon" would have affected the outcome of Petitioner's case.  And, to the extent Petitioner challenged the response to questions about the definition of "deadly weapon," the state appellate court's findings also remain reasonable, as that definition related solely to the

aggravated battery charge, of which the jury acquitted him.  The Court denies Claim 4(c) as meritless.

### d.    Claim 4(d): Failure to Object during the State's Rebuttal Closing Argument

Petitioner next argues that his trial counsel was ineffective for failing to object to the State's remarks during rebuttal closing argument concerning the latex gloves recovered from Taylor Street.  [1] at 66–67.  The state appellate court concluded that counsel was not deficient for failing to object to these remarks because it could be fairly inferred from the evidence that the gloves recovered from Taylor Street bore no connection to the case. *Jeffries* III, No. 2-19-0007, ¶ 17 (citation omitted).

Petitioner challenges the following remarks made by the prosecutor with respect to the Taylor Street gloves:

> *They really have nothing to do with this case.* Officers took them. But when you looked at them, first of all, they are intact. They are full size gloves. One is white and one is clear. They don't look anything like the gloves that were found on the scene, that were found along when – across the street from 855 Richard, that were found in the defendant's car. They don't look anything like that. *They aren't anything that the victims described either.*
>
> But the police are gathering everything. They are trying to collect as much evidence to try to piece together everything to figure out what happened. Those rubber gloves or latex gloves, they collect them. That's fine. *Doesn't mean they are part of the case.*
> …
>
> There are only four hands that had gloves on them. *The gloves on Taylor Street really don't fit. They don't make any sense.* We have enough pieces and there might be a few other pieces that aren't right there, but we have pieces to fit four hands. *We don't need the pieces on Taylor Street.*

*Id.* at 1646-1648 (emphasis added).

44

During closing argument, prosecutors may properly argue reasonable inferences from the evidence the jury has seen and heard, and they did so here. *See United States v. Klebig*, 600 F.3d 700, 718 (7th Cir. 2009); *see also United States ex rel. Hawthorne v. Cowan*, 224 F. Supp. 2d 1178, 1187 (N.D. Ill. Sept. 23, 2002) ("a prosecutor is allowed wide latitude to comment on the evidence during his closing argument"). Whether an inference is reasonable depends upon the particular facts of the case, with the most obvious considerations being whether the evidence bears "logical and proximate connection to the point the prosecutor wishes to prove." *Klebig*, 600 F.3d at 718 (quoting *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995)).

In Petitioner's case, Davis testified that he observed the intruders take off their gloves as they ran down Richard Street, and the police recovered two latex gloves from this area. [16-6] at 690, 807, 809. The police found another latex glove on the driver's seat of Petitioner's car and an additional piece of a glove between the driver's seat and the driver-side door. *Id.* at 1048. They also found fragments of latex gloves in Phongsavath's apartment, including a piece on the staircase. *Id.* at 568. These latex gloves, as the evidence demonstrated, differed in appearance (damaged) and color (yellowish) from the intact gloves recovered from Taylor Street, which were clear and white.[10] *Id.* at 757, 840–41.

Based upon this evidence, a reasonable inference could be drawn that the latex gloves recovered from Taylor Street were not connected to the home invasion. And

---

[10] The photographs admitted at trial showed the differences between the latex gloves found on Richard Street, [16-20] at 40, 44, 46, and those found on Taylor Street, [16-18] at 213, 219; [16-19] at 13, 17.

because this inference falls within the proper scope of closing argument, it was reasonable for the state appellate court to reject Petitioner's claim that his trial attorney was ineffective for failing to object to these remarks.

Nor were the prosecutor's statements prejudicial. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (to establish prosecutorial misconduct, it is not enough that the challenged remarks were improper; rather, "the prosecutors' comments must have so infected the trial with unfairness as to make the resulting conviction a denial of due process"). The prosecutor's proper remarks did not manipulate or misstate the evidence; rather, they were responsive to Petitioner's suggestion in closing argument that the police engaged in shoddy work and a rush to judgment because they failed to test all of the gloves. *Id.* at 1613; *see also Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005) (providing that whether the prosecutor misstated the evidence, whether the defense invited the response, and the weight of the evidence against the defendant are among the factors that courts consider when determining whether a remark was prejudicial). Given Petitioner's argument, it was reasonable for the prosecutor to comment on the Taylor Street gloves and to explain that the police picked up the gloves because they were trying to be thorough and then rejected them as evidence of the subject crimes based upon their appearance.

More importantly, this was not a close case. The jury heard overwhelming evidence of Petitioner's guilt. *See Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000) ("the most important of the *Darden* factors is the weight of the evidence against the defendant"). As a result, counsel's failure to object to the prosecutor's remarks

about the gloves does not constitute ineffective assistance. *See Hough v. Anderson*, 272 F.3d 878, 904 (7th Cir. 2001) ("Because the prosecutor's comments do not rise to the level of a constitutional violation as set forth in *Darden*, defense counsel's failure to object to those arguments cannot be considered prejudicial for purposes of the *Strickland* analysis."). The Court denies Claim 4(d) as meritless.

### e. Claim 4(e): Failure to Argue BB Gun Was Not a Dangerous Weapon

Petitioner next argues that his trial counsel was ineffective for failing to argue that the BB gun used during the home invasion and armed robbery was not a dangerous weapon. [1] at 69. The state appellate court rejected this argument based upon "uncontradicted evidence that one of the victims was bludgeoned with several objects, including the BB gun." *Jeffries III*, No. 2-19-0007, ¶ 18.

In Illinois, an object is considered a "dangerous weapon" if it is used or is capable of being used as a bludgeon. *People v. Ross*, 891 N.E.2d 865, 877–78 (Ill. 2008). Here, Davis told the jury that the intruders bludgeoned him with a BB gun, [16-6] at 675, 1276, a heavy, metal chair, *id.* at 625, 674, and a flowerpot, *id.* at 716. And his injuries (including a bleeding gash on his head), described for the jury, corroborated his testimony. *Id.* at 694. In short, the evidence showed that the BB gun was a dangerous weapon, and the Court cannot fault defense counsel for failing to raise a clearly losing argument. *See Washington*, 884 F.3d at 701 (an attorney cannot be considered constitutionally ineffective for failing to raise a meritless argument). The state appellate court's rejection of Petitioner's ineffective assistance

claim on these grounds was not unreasonable. Claim 4(e) is without merit and denied.[11]

### f. Claim 4(f): Failure to Elicit Testimony Regarding a Show-Up Identification

Petitioner next argues that his trial attorney was ineffective for failing to disclose to him that Davis participated in a show-up identification procedure and for failing to elicit testimony about whether Davis identified Petitioner as one the intruders at trial. [1] at 70–71.

During trial, Petitioner's counsel elicited testimony from Officer Briddell that, on the morning of the home invasion, he had been asked to bring Davis to participate in an identification procedure. [16-6] at 594. Further questioning as to who asked Officer Briddell to bring Davis to the show-up led to an objection that was sustained by the trial court as outside the scope of direct examination. *Id.* The trial court advised counsel she would have to recall Officer Briddell if she wished to "get into the show-up," but she did not do so. *Id.* Petitioner contends that his attorney's failure to elicit more testimony regarding the show-up constitutes ineffective assistance of counsel. [1] at 71.

In addressing this argument on postconviction appeal, the state appellate court noted counsel's question about the show-up at trial but concluded that, because the record did not contain any further information about the show-up, it was "impossible

---

[11] To the extent Petitioner also challenges counsel's failure to argue the objects used during the course of the home invasion were not "deadly weapons," this argument also fails because, as explained above, "deadly weapon" is an element of aggravated battery, *see* 720 ILCS 5/12-3.05(f)(1), an offense for which Petitioner was acquitted. He therefore cannot establish *Strickland* prejudice.

48

to discern" whether counsel's failure to "elicit additional testimony about it" prejudiced Petitioner. *Jeffries III*, No. 2-19-0007, ¶ 19. The state appellate court therefore denied his claim.

This Court presumes "that the state court's factual determinations are correct unless" Petitioner "rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018) (citing 28 U.S.C. § 2254(e)(1); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013)). Thus, for this Court to find that the state postconviction appellate court's decision was "based on an 'unreasonable determination of the facts," *see* § 2254(d)(2), it must find that the court's decision rests "upon fact-finding that ignores the clear and convincing weight of the evidence." *Perez-Gonzalez*, 904 F.3d at 562 (quoting *Newman*, 726 F.3d at 928).

Beyond counsel's mention of a show-up during Officer Briddell's trial testimony, the only other discussion of any type of identification procedure was at a pre-trial hearing on Petitioner's motion to dismiss the indictment. [16-6] at 35, 46. During the hearing, Aurora Police Officer Max Worcester testified that neither Davis nor Phongsavath was shown a line-up or given the opportunity to view a show-up. *Id.* at 46, 47. The record does not contain any further details regarding a show-up identification procedure, much less any showing that an improper one occurred.

Petitioner appears to interpret the record, specifically his attorney's question to Officer Briddell at trial, as implying that a show-up occurred, that Davis viewed it, and that Davis made an identification. [1] at 70–71. But this Court's review of the record, including the testimony given during the pre-trial hearing, suggests the

opposite: that the victims, Davis and Phongsavath, did not participate in any type of identification procedure. As a result, Petitioner's claim, premised upon his theory that Davis participated in a show-up and made an identification, stands rebutted by the record, and Petitioner provides no evidence to the contrary. *See* § 2254(e)(1). Indeed, Petitioner does not even suggest the outcome of any such show-up would help him. The state appellate court reasonably rejected Petitioner's unsupported ineffective assistance of counsel claim, *see* § 2254(d)(2), and this Court thus denies Claim 4(f) as meritless.

### g. Claim 4(g): Failure to Request Continuance for DNA Testing

Finally, Petitioner argues that his trial counsel was ineffective for failing to request a continuance during trial to conduct DNA testing on the hair that was contained in the evidence bag with the latex glove recovered from Phongsavath's staircase. [1] at 72. In support of this argument, Petitioner submitted a self-executed affidavit in which he avers that the reason the hair was not tested was because his attorney first learned of it during trial.[12] *Id.* at 73. He contends that his counsel should have requested a continuance to conduct DNA testing upon learning of the hair because the results could have exonerated Petitioner. *Id.*

Petitioner raised this issue during the pendency of his direct appeal, when he filed the motion asking the trial court to order DNA testing on the hair. [16-8] at 1–3. Petitioner's theory was that, if the DNA on the hair was inconsistent with his DNA

---

[12] Petitioner submitted the same affidavit with his *pro se* postconviction petition. [16-7] at 43.

profile, and those of Simmons, Davis, and Phongsavath, he would be proved innocent. *Id.* at 2–3.

On appeal from the trial court's denial of this motion, the state appellate court held that testing of the hair would not "significantly advance" Petitioner's "actual-innocence claim" because: (1) the State's evidence was strong, and the hair was not likely to yield evidence to undermine the case, and (2) hairs are too readily shed and too likely to be accidentally moved to provide reliable evidence of the intruders' identity. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶¶ 19–20; *see also* 725 ILCS 5/116-3(c)(1)(i) (DNA testing shall be allowed if the result has the potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence). In reviewing Petitioner's argument in the context of an ineffective assistance of trial counsel claim on postconviction appeal, the state appellate court held that in light of its holding in *Jeffries II*, Petitioner could not have been prejudiced by counsel's failure to seek DNA testing. *Jeffries III*, No. 2-19-0007, ¶ 20.

The state appellate court's adjudication of Petitioner's claim on *Strickland*-prejudice alone was perfectly acceptable. If it is "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697; *see also Thill v. Richardson*, 996 F.3d 469, 476–77 (7th Cir. 2021) (quoting *Taylor v. Bradley*, 448 F.3d 942, 949 (7th Cir. 2016)) ("'it is unnecessary and undesirable for [a habeas court] to consider the attorney performance facet of the analysis' when 'an ineffectiveness claim may be disposed of on the basis of lack of prejudice'"). And the postconviction

appellate court's holding of no *Strickland* prejudice was similarly not unreasonable. As the state appellate court concluded in *Jeffries II*, the hair would not have been a reliable source of identification evidence given how easily hair is shed and transferred from one object to another. Simmons testified that the latex gloves that he and Petitioner wore during the attack came from Petitioner's house, [16-6] at 1272, and the hair therefore could have belonged to any number of people, as it could have been transferred onto the glove at Petitioner's house, or in the car during the drive to the crime scene, or from the intruders' clothing when putting the gloves on their hands. Alternatively, the hair could have been left on Phongsavath's staircase by a visitor and subsequently transferred to the glove. No matter how the hair came to land on the glove, the mere fact that it was there does not reliably establish the identity of the intruder; nor does it undermine the substantial evidence introduced at trial establishing Petitioner as the intruder.

As discussed, the evidence of Petitioner's guilt remained overwhelming. Simmons admitted his involvement and named Petitioner as his partner in crime, and ample evidence corroborated Simmons' testimony: Petitioner owned the getaway car; Petitioner fled from police and was found hiding nearby; Petitioner's DNA was found on one of the latex gloves; and the stolen Samsung Galaxy tablet was found where Petitioner jumped a fence while trying to flee. Even if Petitioner's counsel had requested DNA testing on the hair, and even if that testing had not matched Petitioner, the Court has not reason to think the results would have altered the outcome of Petitioner's trial. *See Carter v. Douma*, 796 F.3d 726, 737 (7th Cir. 2015)

("A guilty verdict that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record."). The Court denies Claim 4(g) as meritless.

### 2.    Claim 5(c): The State's alleged withholding of evidence of strand of hair that was found with the latex glove recovered from the staircase

Petitioner argues that the prosecution knowingly withheld evidence of a hair that was found in the glove recovered on the staircase at the crime scene. [1] at 76. The record shows that the hair was not concealed from Petitioner; but it is true that DNA testing on the hair was not done. *Jeffries II*, 2019 IL App (2d) 161095-U, ¶ 8. As a result, no one (including Petitioner knows what DNA testing would reveal about the hair). But his assertion that the hair would exonerate him lacks any basis in the record.

Claim 5(c) amounts to a rehash of Claim 4(g) recast as a due process claim. Despite the recast, the reasoning set forth above remains equally applicable. Nothing in the record suggests that the subject hair bears any relevance to this case. And, given the overwhelming evidence against Petitioner, any concerns he has about the failure to test the hair remain unfounded. *Brecht v. Adrahamson*, 507 U.S. 619 (1993). The Court denies claim 5(c).

### 3.    Claim 7(a): Ineffective Assistance of Appellate Counsel Claim for Failing to Challenge Sufficiency of the Evidence

Turning to Petitioner's ineffective assistance of appellate counsel claim, he argues that counsel was ineffective for failing to challenge on direct review the sufficiency of the evidence. [1] at 38, 41–44. To support his claim, Petitioner submits

53

a self-executed affidavit and letters that he received from his appellate counsel, all of which were included with his *pro se* postconviction petition, [16-7] at 64–69. He claims appellate counsel acknowledged that he had a viable sufficiency of the evidence challenge based upon Phongsavath's purported shaky recollection of events and Simmons' impeached credibility. *Id.* at 41-44; [1] at 45–50.

Ineffective assistance claims relating to appellate counsel, like claims relating to trial counsel, remain governed by *Strickland. See Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). But where the claim challenges counsel's decision about which issues to present on appeal, a "special gloss" is added to *Strickland*'s deficient-performance and prejudice prongs. *Id.* "Appellate counsel is not required to present every non-frivolous claim on behalf of her client." *Id.* Rather, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id.* (citing *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). Therefore, "appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised." *Id.* at 898 (citing *Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010); *Lee v. Davis*, 328 F.3d 896, 900–01 (7th Cir. 2003)).

On postconviction appeal, the state appellate court, the last state court to address this issue on the merits, applied the correct standard, and held that Petitioner could not establish ineffective assistance because the evidence remained

"clearly sufficient" to support his conviction and Petitioner thus "suffered no prejudice from counsel's failure to raise" the frivolous sufficiency claim. *Jeffries III*, No. 2-19-0007, ¶ 21. This decision was neither contrary to, nor an unreasonable application of, clearly established federal law. § 2254(d)(1).

What's more, although the state appellate court did not need to address *Strickland*'s performance prong (given the lack of prejudice), *see Strickland*, 466 U.S. at 697; *Thill*, 996 F.3d at 476–77, counsel's letters confirmed that he investigated the issue Petitioner tried to raise about Phongsavath's recollection of events and determined that the issue lacked merit. [1] at 46. As counsel explained to Petitioner:

> The jury in your case received the stipulation regarding the 911 time records and evaluated that stipulation along with the other evidence. … Unlike alibi evidence, the records do not establish your presence at a location other than the crime scene at the time of the incident. In fact, they are arguably inculpatory, in that they establish your presence near the scene minutes after the incident occurred. Although the times recorded by the 911 dispatcher … demonstrate that things moved very quickly that morning, and even cast some doubt on the way the victims might have remembered certain events, those times do not exclude you as a perpetrator.

*Id.* at 47. Counsel also discussed Simmons' testimony and credibility, advising Petitioner that the jurors "heard Simmons impeached at trial with the revelation of his favorable plea deal with the State, as well as his initial lack of cooperation with the police," but that it was within their province to determine what weight to give his testimony in light of that impeachment. *Id.* at 49. The record thus shows that appellate counsel considered the claims Petitioner raised, and then reasonably exercised his professional judgment in selecting what issues to raise on direct appeal.

Moreover, given the overwhelming evidence of Petitioner's guilt, Petitioner

cannot establish *Strickland* prejudice from any failure to raise the sufficiency claim on appeal. Claim 7(a) is without merit and denied.

## III. Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts because there is no substantial showing of a denial of a constitutional right in this case. *See Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, & n.4 (1983)); *Davis v. Borgen*, 349 F.3d 1027, 1028 (7th Cir. 2003) (setting forth requirements for a certificate of appealability).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. If Petitioner wishes the Court to reconsider its judgment, however, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See*

Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## IV. Conclusion

For the reasons above, the Court denies Petitioner's habeas corpus petition [1] and strikes all set dates and all pending motions. The Court declines to issue a certificate of appealability. The Clerk shall: (1) update the docket to reflect that Felicia Adkins is the warden of Danville Correctional Center; and (2) enter a Rule 58 Judgment in favor of Respondent and against Petitioner.

Dated: March 29, 2024                    Entered:

John Robert Blakey
United States District Judge